## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

RHONDA FLEMING,

      Plaintiff,

v.                               Case No. 4:21-cv-325-MW-MJF

ERICA STRONG,
WARDEN OF FCI-TALLAHASSEE,

      Defendant.

_____/

### PLAINTIFF RHONDA FLEMING'S RESPONSE TO DEFENDANT ERICA STRONG'S MOTION FOR SUMMARY JUDGMENT

Gender identity and gender dysphoria are real. *See Doe v. Ladapo*, 676 F. Supp. 3d 1205, 1211 (N.D. Fla. 2023). This case is not about challenging the legitimacy or reality of individuals struggling with or treating gender dysphoria. Instead, Rhonda Fleming seeks to vindicate and protect her constitutional right to bodily privacy. As much as anyone can sympathize or empathize with inmates struggling with or treating gender dysphoria, the Constitution nevertheless ensures that inmates have the right to not expose their private parts to members of the opposite biological sex. *See Fortner v. Thomas*, 983 F.2d 1024, 1026 (11th Cir. 1993). And in those unfortunate instances when individual sympathy clashes with constitutional rights, the Constitution must prevail. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1278 (11th Cir. 2020) ("Make no mistake, we too have

1

sympathy for Ms. Keohane, and we too regret her predicament. But our first obligation—our oath—is to get the law right.").

In this case, the Bureau of Prisons' adoption and implementation of the Transgender Policy, which allows inmates to self-report their gender identity without verification and be housed according to that identity, resulted in a violation of Ms. Fleming's constitutional right to bodily privacy when she was forced to expose her private parts to inmates who are members of the opposite biological sex. The arguments Erica Strong puts forth for summary judgment fall short on all fronts. Genuine disputes of material fact remain for the Court to decide at trial, where the Court can weigh contradictory evidence and make credibility determinations based on witness testimony. As a result, the Court should deny Strong's motion for summary judgment.

## Statement of Facts[1]

---

[1] Local Rule 56.1(B) requires a motion for summary judgment to include a statement of facts "generally in the form that would be appropriate in an appellate brief." Similarly, under Local Rule 56.1(C), a response to motion for summary judgment "must respond to the moving party's statement of facts as would be appropriate in an appellate brief."

In the Eleventh Circuit, and other circuits, the "Statement of the Case" section is generally written in narrative form—not numbered paragraphs. *See generally* 11th Cir. 28-5; *see also* Fed. R. App. P. 28(a)(6). Strong's motion for summary judgment includes, in numbered-paragraph form, a section in entitled "Statement of Undisputed Material Facts." (Doc. 134 at ¶¶ 1–39). Consistent with Local Rule 56.1(C), Ms. Fleming responds to Strong's statement of facts as "would be appropriate in an appellate brief" (i.e., narrative form). To the extent any ambiguity exists because of this incongruence between Strong's motion and the Local Rules, Ms. Fleming clearly states that disputes exist within the entirety of Strong's "Statement of Undisputed Material Facts." (*See* Doc. 134 at ¶¶ 1–39).

<u>Ms. Fleming's Genitalia Involuntarily Exposed to Biological Males</u>

From October 2018 to January 2022, Rhonda Fleming resided as an inmate at Federal Corrections Institute (FCI) Tallahassee. Fleming Dep. 7:12-15. During this time, FCI Tallahassee housed at least two other inmates who were biological males: CJ and ET. Fleming Dep. 23:18-22; *see also* (Doc. 134 at ¶ 20). While housed together at FCI Tallahassee, Fleming interacted with CJ two or three times a week and with ET daily. Fleming Dep. 23:23-24; 26:13-15.

Inmates at FCI Tallahassee—regardless of whether they live in Housing Unit A South or A North—share communal showers and toilets. Fleming Dep. 11:2-19; 15:13-16. If the showers or toilets were broken in one housing unit, then the inmates had to use the showers and toilets in the other housing unit. Fleming Dep. 15:13-16. The toilet stalls had no doors but were instead covered by old shower curtains that provide no privacy. Fleming Dep. 16:11-15. The curtains covering the toilets were sometimes damaged and taken down. Fleming Dep. 17:17-19. The curtains did not cover the sides of the individual toilet stalls. Fleming Dep. 16:11-24. Anyone walking by can see whoever is using the toilet. Fleming Dep. 16:16-24.

The curtains covering the showers were not always up and were infrequently torn and pulled down until replaced. Fleming Dep. 16:25–17:1-16. The curtains do not fully cover each shower. Fleming Dep. 18:18-20. When an inmate is showering, she faces another inmate in a shower 18 to 20 inches away. Fleming Dep. 18:6-13.

The curtains are very flimsy. Fleming Dep. 19:9-17. When someone walks past a shower, the curtain moves; and if water is shooting out from the shower, the curtain moves. Fleming Dep. 19:9-17. Because the shower curtains are nasty and filthy, many inmates push the curtains to the side while they shower. Fleming Dep. 31:2-4. Ultimately, the shower curtains do not provide privacy for the inmates while they shower. Fleming Dep. 19:9-17. As a result, the inmates, including Ms. Fleming, are regularly exposed (private body parts and genitalia) to each other. Fleming Dep. 83:11-19.

CJ was in the shower at the same time as Ms. Fleming two or three times. Fleming Dep. 26:5-8. ET was in the shower with Ms. Fleming at least twice daily. Fleming Dep. 27:10-25–28:1-24; 84:7-11. Thus, during these showers, Ms. Fleming's private parts and genitalia were exposed to biological males CJ and ET. Fleming Dep. 83:11-24–84:1-14.

<u>Bureau of Prisons' Transgender Policy</u>

In 2017, the Bureau of Prisons (BOP) codified its Transgender Policy in Program Statement 5200.04. (Doc. 14-1). That policy allows BOP to house biological males in female prisons. (Doc. 14-3). CJ and ET were housed in FCI Tallahassee pursuant to the BOP's Transgender Policy. Fleming Dep. 22:3-13.

When formulating, adopting, and implementing the Transgender Policy, BOP gave no consideration to how the policy would affect biological female inmates'

4

right to bodily privacy. Ex. B. at 7–9; Ex. C. at 6. Further, the only consideration BOP gave to how the Transgender Policy would affect staff and personnel involved the staff's use of pronouns. Ex B. at 10; Ex. C at 6. Because the Transgender Policy resulted in a violation of her right to bodily privacy, Ms. Fleming seeks to enjoin enforcement of the Transgender Policy. Fleming Dep. 84:15-18.

## Memorandum of Law

### I.    <u>Standard of Review</u>

Summary judgment is appropriate if no genuine despite of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome in the case under governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). If the nonmoving party fails "to make a sufficient showing on an essential element of her case with respect to which has the burden of proof," then the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To overcome summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting previous version of Rule 56(e), which is now Rule 56(c)).

"It is the function of the [factfinder at trial] to observe demeanor and listen to testimony in order to determine the credibility of witnesses." *See United States v.*

*Davis*, 809 F.2d 1509, 1512–13 (11th Cir. 1987). Thus, if the Court must determine credibility or make factual inferences in the moving party's favor, summary judgment is improper because the appropriate time to do so is at trial when the Court has the benefit of observing witnesses during direct and cross examination. *See Carnival Cruise Line v. Stankovic*, No. 16-20353-Civ-COOKE/TORRES, 2017 WL 1378568, at *1 (S.D. Fla. Apr. 11, 2017) (Cooke, J.) ("It is well settled in this Circuit that personal observation of testimony is the *sine qua non* of determining witness credibility."); *see also United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("[T]he fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.").

Summary judgment may be granted only on those issues the moving party raises in its initial motion. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *see also Gov't Emps. Ins. Co. v. Glassco Inc.*, No. 8:19-cv-1950-KKM-JSS, 2021 WL 4391717, at *9 n.14 (M.D. Fla. Sept. 24, 2021); *Pin-Pon Corp. v. Landmark Am. Ins. Co.*, 500 F. Supp. 3d 1136, 1346–47 (S.D. Fla. 2020).

At all times, the Court must consider all evidence in the record and draw all reasonable inferences in favor of the nonmoving party. *Cleveland v. Home Shopping Network Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004).

**II.**    **This Court Has Subject Matter Jurisdiction over Ms. Fleming's Bodily-Privacy Claim**

Strong argues that the Court need not even reach the merits of Ms. Fleming's bodily-privacy claim because the Court lacks subject matter jurisdiction over her claim. (Doc. 134 at 11–18). Strong bases this argument by claiming two things: (1) Ms. Fleming never suffered an injury in fact; and (2) Ms. Fleming's claim is moot. (*See id.*). Strong's argument falls short on both fronts.

*A. BOP Violated Ms. Fleming's Constitutional Right to Bodily Privacy*

Prisoners have a constitutional right to bodily privacy. *Fortner*, 983 F.2d at 1026. This constitutional right protects a prisoner from exposing her private parts to members of the opposite biological sex. *See Adams ex rel. Kasper v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791, 805 (11th Cir. 2022). Each prisoner's right to bodily privacy is inherent to human dignity:

> We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figured from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.[2]

Although prisoners surrender many rights as a result of their imprisonment, their constitutional right to bodily privacy from members of the opposite biological sex remains:

> Persons in prison must surrender many rights of privacy which most people may claim in their private homes. Much of the life in prison is

---

[2]  *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963).

communal, and many prisoners must be housed in cells with openings through which they may be seen by guards. Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons.[3]

Thus, Ms. Fleming's constitutional right to not expose her personal parts to members of the opposite biological sex is clear, and Strong does not dispute that in the motion for summary judgment. *See* (Doc. 134).

Instead, Strong argues that Ms. Fleming fails to satisfy the *Lujan*[4] factors needed to satisfy standing because (a) Ms. Fleming never had to expose her private parts to members of the opposite biological sex (Doc. 134 at 12–14) and (b) Ms. Fleming no longer resides at FCI Tallahassee where the constitutional violations occurred (Doc. 134 at 14–16). Both arguments fail.

In defining what constitutes a member of the opposite biological sex, this Court should look to Eleventh Circuit precedent and dictionary definitions that define "male" and "female" based on biology and reproduction function. *See Adams*, 57 F.4th at 812–13. Under those authorities, "biological male" means "being the sex that produces gametes that fertilize eggs of a female." *See Male*, *Merrian-Webster's Collegiate Dictionary* 752 (11th ed. 2020); *see also Adams* 57 F.4th at 812–13.

---

3  *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981).

4  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Similarly, "biological female" means "an individual that bears young or produces large . . . immobile gametes (as eggs) that are fertilized by small motile gametes of a male." *See Female*, *Merrian-Webster's Collegiate Dictionary* 460–61 (11th ed. 2020); *see also Adams* 57 F.4th at 812–13.

Thus, under Strong's use of the terms, which is based on Judge Hinkle's definition in *Doe*, a transgender female is a biological male, and a transgender male is a biological female. (*See* Doc. 134 at 2); *see also* Fleming Dep. 9:2-19. As a result, any time Ms. Fleming was forced to expose herself to a biological male (transgender female), her constitutional right to not expose herself to members of the opposite biological sex was violated. *See Fortner*, 983 F.2d at 1026; *Adams*, 57 F.4th at 805.

1. BOP's Transgender Policy resulted in Ms. Fleming having to expose her private parts to members of the opposite biological sex.

Ms. Fleming, as a result of BOP's Transgender Policy, was forced to expose her private parts to members of the opposite biological sex. To the extent any dispute exists on that point, that is a material fact for the Court to determine at trial. *See Ramirez-Chilel*, 289 F.3d at 749.

While incarcerated at FCI Tallahassee, Ms. Fleming was housed with biological males: ET and CJ. Rhonda Dep. at 10:24-25–11:1–5; 12:24-25–13:1-5. ET and CJ were housed with Ms. Fleming and other biological females consistent with the BOP's Transgender Policy. Rhonda Dep. at 22:3-19. During this period, Ms. Fleming showered with CJ two or three times. Rhonda Dep. at 26:5-8. Ms.

Fleming also showered regularly (at least twice a day) with ET. Rhonda Dep. at 27:10-23; 84:7-11. Due to the nature of the close-quartered environment of these communal prison showers, Ms. Fleming's private parts and genitalia were regularly exposed to CJ and ET—both biological males. Rhonda Dep. 28:25–29:1-10; 83:11-25–84:1-14. Thus, Ms. Fleming's constitutional right to bodily privacy was violated when, consistent with the BOP Transgender Policy, she was forced to expose her private parts to members of the opposite biological sex; namely, CJ and ET. *See Fortner*, 983 F.2d at 1026; *see also Bowling v. Enomoto*, 514 F. Supp. 201, 203–04 (N.D. Cal. 1981) ("[I]n the normal social setting which prison inmates are ostensibly being rehabilitated to function within, people do not undress, bathe, or defecate in the presence of strangers of the opposite sex."); Fed. R. Civ. P. (56)(c)(1)(A) (requiring that a party asserting that a fact is genuinely disputed must support that opposition by "citing to particular parts of materials in the record, including depositions").

Strong's argument that Ms. Fleming did not suffer a violation of her constitutional right to bodily privacy lacks any support in the record. To begin, Strong states: "Plaintiff's own testimony is that she has never been forced to change in front of anyone, regardless of their sex or gender." (Doc. 134 at 13). But the portion of Ms. Fleming's deposition transcript that Strong cites to support that

statement does not support that assertion. (*See id.*) (citing Fleming Dep. 33:7-11).

The following is a full quotation of the portion Strong cited:

> Q. Have you ever changed your clothes in your -- in your cubicle?
>
> A. Never. In 16 years in prison, no one has ever seen me in my cubicle or even in my cell right now getting dressed. That is against the rules.[5]

Ms. Fleming's testimony in that cited portion of her deposition does not say—contrary to Strong's assertion—that she was never forced to change in front of anyone. That flaw alone dooms Strong's argument. *See* Fed. R. Civ. P. 56(c)(1) (requiring the party asserting that a fact cannot be disputed to cite evidence and materials supporting that assertion). In direct contrast to Strong's erroneous assertion, Ms. Fleming testified about how the close-quartered communal showers and toilets, which Ms. Fleming had to use to practice regular hygiene, by their very nature required regular, unscheduled use by all inmates—biological females and males. Fleming Dep. 28:14–24.

With respect to Strong's assertion that the shower curtains somehow negated the possibility of Ms. Fleming exposing herself to biological males (another assertion unsupported by Strong's record citations), Ms. Fleming testified that the shower curtains fail to adequately provide privacy to the inmates. Fleming Dep. 30:1-11. Thus, what Strong characterizes as "mere allegations" is detailed, sworn

---

[5] Fleming Dep. at 33:7-11.

deposition testimony establishing a violation of Ms. Fleming's constitutional right to bodily privacy. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) ("[A] case should be put to the [factfinder] if there is any genuine issue of material fact, including one created solely by the testimony of a party.").

To the extent that Strong disagrees about Ms. Fleming's need to regularly practice hygiene without first ensuring that CJ or ET were in the showers or about whether the shower curtains adequately protected Ms. Fleming from exposing her private parts to CJ or ET, those are genuine factual disputes that will require the Court to weigh evidence and determine credibility at trial. *See Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006) ("Even if the district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."); *see also Feliciano*, 707 F.3d at 1252. As a result, the Court should deny Strong's motion for summary judgment based on her argument that Ms. Fleming's constitutional right to bodily privacy was never violated.

2. <u>Ms. Fleming is entitled to declaratory and injunctive relief</u>

Strong's next argument that Ms. Fleming lacks standing to pursue declaratory or injunctive relief because she no longer resides at FCI Tallahassee misapprehends the procedural posture of this case and caselaw involving constitutional violations. In its order adopting Judge Frank's Report and Recommendation, this Court allowed

Ms. Fleming to proceed on her "official-capacity constitutional bodily-privacy claim seeking declaratory and injunctive relief concerning the BOP's Transgender Policy." (Doc. 91 at 2). Thus, Ms. Fleming's bodily-privacy claim is against Erica Strong, a federal official, in her official capacity as warden of FCI Tallahassee. (*See id.*).

"A suit against an official of the federal government in the officer's official capacity is considered a suit against the United States." *Keel v. U.S. Dep't of Air Force*, 256 F. Supp. 2d 1269, 1282 (M.D. Ala. 2003) (citing *Kentucky v. Graham*, 473 U.S. 156, 165 (1985)); *see also* (Doc. 88 at 19) (citing *Graham*). So, even though Strong is the named defendant in this matter, Ms. Fleming's claim for injunctive and declaratory relief is against the United States—not just FCI Tallahassee—because Ms. Fleming sued Strong in her official capacity.

Further, the Transgender Policy is a national policy that the BOP practices, and Ms. Fleming is not set to be released from federal incarceration until 2032. (Doc. 134 at ¶¶ 2, 29–39). Given Ms. Fleming's repeated past violations of her constitutional right to bodily privacy under the Transgender Policy and her continued incarceration in a system still subject to the Transgender Policy, the substantial likelihood of irreparable harm to Ms. Fleming remains without injunctive or declaratory relief. *See Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 20 (2008). As a result, the Court should reject Strong's argument that summary judgment is appropriate on Ms. Fleming's claim for declaratory and injunctive relief against the

Transgender Policy because Ms. Fleming's claim seeks relief against the United States—not just Strong or FCI Tallahassee—and Ms. Fleming will remain subject to the national Transgender Policy until 2032.

### B. Ms. Fleming's Bodily-Privacy Claim Remains Ripe

Strong argues that Ms. Fleming's bodily-privacy claim is moot because she longer resides at FCI Tallahassee. (Doc. 134 at 16–17). Again, this argument fails to appreciate that Ms. Fleming's remaining claim is effectively against the United States—not just Strong or FCI Tallahassee—and that Ms. Fleming remains subject to the Transgender Policy. *See supra* at 12–14. What's more, Ms. Fleming's bodily-privacy claim is not moot because the voluntary-cessation exception applies. Otherwise, the BOP can simply transfer an inmate any time his or her right to bodily privacy is violated under the Transgender Policy. Further, the capable-of-repetition-yet-evading-review doctrine exception to mootness applies here because of the high likelihood of a repeat violation of Ms. Fleming's constitutional right to bodily privacy under the Transgender Policy.

### 1. The voluntary-cessation doctrine applies.

"A case is moot when 'there is no reasonable expectation that the wrong will be repeated.'" *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla.*, 55 F.4th 1312, 1316–17 (11th Cir. 2022). "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave 'the

14

defendant free to return to his old ways.'" *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 204 (1968) (cleaned up). To truly moot a claim, "the party that voluntarily ceased the challenged conduct must make it 'absolutely clear that the . . . behavior could not reasonably be expected to recur.'" *Norwegian Cruise*, 55 F.4th at 1317 (quoting *Concentrated Phosphate*).

Strong's mere cessation by transferring Ms. Fleming to a different federal facility where the Transgender Policy still applies does not moot this case because Strong—or more accurately, the United States—has not made it absolutely clear that the same constitutional violation cannot be reasonably expected to occur. Strong or the United States cannot guarantee this because while the Transgender Policy remains in effect nationally, a reasonable danger exists that Ms. Fleming's constitutional right to bodily privacy will again be violated when she is forced to expose her private parts to a biological male at a different federal facility that is subject to the Transgender Policy.

Since her transfer from Tallahassee, Fleming resided in another federal facility where the shower and toilet facilities are completely open and no opportunity for privacy exists. Fleming Dep. 77:8-25–78:1-6. So the chances of this issue (Ms. Fleming involuntarily exposing her private parts to members of the opposite biological sex) recurring remain as long as BOP enforces the Transgender Policy. As a result, the voluntary-cessation doctrine dictates that Ms. Fleming's bodily-

privacy claim is not moot. To conclude otherwise would encourage Strong and the BOP to simply transfer an inmate to a different federal facility once that inmate suffers irreparable harm under an unconstitutional policy or practice.

2. <u>The capable-of-repetition-yet-evading-review exception to mootness applies.</u>

Even if the Court concludes that the voluntary-cessation doctrine does not apply to Ms. Fleming's bodily-privacy claim, the capable-of-repetition-yet-evading-review exception to mootness applies to this case.

"The capable-of-repetition-yet-evading-review doctrine is an exception to the general rule that federal courts do not have jurisdiction over moot cases." *Stringer v. Whitley*, 942 F.3d 715, 724 (5th Cir. 2019). In *Friends of Earth Inc. v. Laidlaw Environmental Services (TOC) Inc.*, the Supreme Court discussed this exception in detail and provided an example based in precedent:

> When, for example, a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer will not moot the action despite the fact that she would have lacked initial standing had she filed the complaint after the transfer. Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.[6]

In this case, even if Ms. Fleming's bodily-privacy claim is moot, the capable-of-repetition-yet-evading-review exception, as described in *Friends of Earth*,

---

[6] *Friends of Earth Inc v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167, 190–91 (2000) (internal citations omitted).

applies. Ms. Fleming resided at FCI Tallahassee in 2021—when she filed her initial complaint in this case. (Doc. 134 at ¶ 1); (Doc. 1). Based on her arguments in the motion for summary judgment, Strong would not dispute that Ms. Fleming had standing at the time she filed the initial complaint. (*See* Doc. 134 at 16–17). So just as the mentally disabled patient's challenge to her confinement would not have been moot if she was transferred after filing her complaint, so too is Ms. Fleming's claim not moot where she challenged a constitutional violation that occurred while at FCI Tallahassee and was subsequently transferred. Further, Ms. Fleming's bodily-privacy claim is capable of repetition because she will be incarcerated in a federal facility until 2032 and the Transgender Policy will continue to apply to any federal facility in which Ms. Fleming resides. As a result, a substantial danger exists that Ms. Fleming's constitutional right to bodily privacy will again be violated when, consistent with the Transgender Policy, she is housed with a biological male and she is forced to expose her private parts to that biological male. Therefore, even if Ms. Fleming's bodily-privacy claim is moot, the capable-of-repetition-yet-evading-review exception applies. The Court should deny summary judgment on this issue.

### III.    Genuine Disputes of Material Fact Exist About Whether the BOP's Transgender Policy Satisfies the *Turner* Factors

Strong argues that summary judgment is appropriate on the merits of Ms. Fleming's bodily-privacy claim because the Transgender Policy is reasonable under *Turner v. Safley*, 482 U.S. 78 (1987). (Doc. 134 at 18–22). But summary judgment

is inappropriate because genuine disputes of material fact exist about whether the Transgender Policy satisfies the *Turner* factors.

To determine whether a prison regulation or policy unreasonably violates an inmate's constitutional right to bodily privacy, a court must look to four factors the Supreme Court outlined in *Turner*. *See Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). The first *Turner* factor requires that "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. The second *Turner* factor asks "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* The third *Turner* factor considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* And the fourth *Turner* factor posits that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.*

Genuine disputes of material fact exist with respect to each *Turner* factor in this case; thus, summary judgment is inappropriate. *See* Fed. R. Civ. P. 56(a).

> A. *No valid, rational connection exists between the Transgender Policy and any legitimate governmental interest.*

In her motion for summary judgment, Strong argues that BOP "has a valid and rational connection between developing its Transgender Housing Policy and providing suitable and safe living quarters for its transgender population, particularly

after receiving requests for guidance from its field branches and the development of [Prison Rape Elimination Act (PREA) of 2003]." (Doc. 134 at 19). Despite this assertion, Strong's entire argument on the first *Turner* factor is missing a vital ingredient: A citation to record evidence. (*See id.*). This omission alone is fatal. *See* Fed. R. Civ. P. 56(c)(1). So the Court should deny summary judgment on this issue based on Strong's failure to cite record evidence showing that a valid, rational connection exists between the Transgender Policy and any legitimate governmental interest.

Even if the Court considers the record evidence on this first *Turner* factor, summary judgment is inappropriate. Attached to Strong's motion is a declaration from Alix McLearen, who serves as Special Assistant to the Director's Office at the BOP. (Doc. 133-2 at ¶ 3). McLearen "was instrumental in developing the BOP's Transgender Offender Manual and the procedures and staff trainings for working with this population." (*Id.* at ¶ 4). But nowhere in McLearen's declaration is any discussion or statement (a) what governmental interest the Transgender Policy furthers and (b) how a valid, rational connection exists between the governmental interest and the Transgender Policy. (*See* Doc. 133-2).

Instead of providing the governmental interest and explaining how the Transgender Policy furthers that interest, McLearen states that "BOP relies on an inmates' self-reporting as to whether the inmate designates him or herself as

transgender." (Doc. 133-2 at ¶ 11). An inmate's self-reporting on his or her transgender status cannot reliably further any legitimate governmental interest.

In response to an interrogatory asking for the penological interest served by the Transgender Policy, Strong asserted that the Transgender Policy "serves to maintain the safety and security of BOP facilities." Ex. B. at 3. But that assertion is undermined by Strong's answers to other interrogatories. For instance, in an interrogatory asking for the consideration given to the effect that the Transgender Policy would have on correctional officers and other BOP employees, Strong's entire consideration of those individuals comes down to one issue: the staff's use of pronouns. Ex. B. at 10; *see also* Ex. C at 6 (admitting that "the only consideration BOP gave to the Transgender Policy's effect on correctional officers and other BOP employees was the staff's use of pronouns).[7] To assert that the Transgender Policy "serves to maintain the safety and security of BOP facilities" while only considering how the policy will affect the staff's use of pronouns is contradictory evidence at best, which the Court should weigh along with McLearen's testimony at trial. *See Cavin v. Belfry*, No. 2:17-cv-00031, 2018 WL 3745734, *3 (W.D. Mich. July 5, 2018) ("Dismissal is not appropriate where the record fails to support a penological justification for a strip search.") (citation omitted), *adopted*, 2018 WL 3729531.

---

[7] Strong never responded to Ms. Fleming's Request for Admissions. As a result, those requests are deemed admitted. *See* Fed. R. Civ. P. 36(a)(3).

*Cavin* is instructive on this issue. There, the district court denied summary judgment on a Section 1983 claim a prisoner brought against a correctional institute because of a violation of his right to privacy. *Cavin*, 2018 WL 3745734, at *1. Cavin based his claim on prison officials forcing him to remove his clothing in front of 15 to 20 other prisoners and a biological female prison officer. *Id.* The district court began its analysis by acknowledging that Cavin had a right to not expose his body unnecessarily to guards of the opposite sex. *Id.* at *3 (discussing *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987)). The court also recognized that, generally, courts "must defer to the judgment of prison officials unless the record establishes that prison policies and procedures are unreasonable." *Cavin*, 2018 WL 3745734, at *4.

Cavin argued that the defendant had no penological justification for requiring him to expose himself to other prisoners and female officers. *Id.* The defendant argued that a penological need existed but failed to support her argument with any evidence. *Id.* In rejecting the defendant's penological justification, the court dissected the defendant's argument:

> In her brief [the defendant] states: (1) "it was a high level security area" and (2) "these were prisoners that were on their way to be transported out of the prison with only three officers involved." Defendant has made no effort to explain the need for the group strip search. In fact, in her answers to interrogatories, she relies solely on a policy directive regarding searching incoming prisoners. According to Defendant, that policy is "exempt" from discovery and is not a part of the Court record. Defendant has failed to provide any evidence or support for her argument that there existed a penological need for the group strip

search. Additionally, the Defendant has not explained why she was present during the search.[8]

The court also found that the defendant failed to explain why she failed to use an alternative procedure to a public strip search. *Cavin*, 2018 WL 3745734, at *6. As a result, the court found that the defendant failed to meet her burden to establish a qualified-immunity defense: "Defendant has failed to properly support her motion for summary judgment with relevant evidence showing the existence of a legitimate penological need for the group strip search and why her presence inside the chapel was necessary at the time of the search." *Id.* As a result, the court denied the defendant's motion for summary judgment. *Id.*

Just as the defendant in *Cavin* failed to support her motion with relevant evidence showing the existence of a legitimate penological need for exposing the plaintiff's private parts to a female officer, so too has Strong failed to support her claim that the Transgender Policy, which resulted in Ms. Fleming exposing her private parts to biological males, furthers any legitimate penological interest. Nowhere in McLearen's declaration does she state what legitimate penological interest the Transgender Policy furthers. (Doc. 133-2). Although Strong asserted that the Transgender Policy "serves to maintain the safety and security of BOP

---

[8]  *Cavin*, 2018 WL 3745734, at *5.

facilities,"[9] that language is used nowhere in the Transgender Offender Manual. (*See* Doc. 133-5). The lack of any evidence to showing that the Transgender Policy furthers a legitimate penological interest is fatal to Strong's argument. This Court should follow the reasoning in *Cavin* and deny summary judgment on this issue. *See also Mitchell v. Stewart*, 608 F. App'x 730, 735 (11th Cir. 2015) ("We find it was clearly established at the time of incident in question that that the Plaintiffs had a broad constitutional right to bodily privacy, and that in the light most favorable to the Plaintiffs, a reasonable jury could find that the Defendants violated that right.").

### B. No alternative means exist to protect Ms. Fleming's bodily privacy.

The second *Turner* factor considers whether "'other avenues' remain available for the exercise of the asserted right." *Turner*, 482 U.S. at 90. Strong argues that the shower curtains in the communal showers and toilets provide an alternative means to protect Ms. Fleming's bodily privacy. (Doc. 134 at 19). Strong also argues that BOP regulations require inmates to always be dressed and that inmates who fail to remain dressed can be subject to discipline. (*Id.* at 19–20). But contradictory evidence exists on these assertions.

Ms. Fleming testified that the showers, which are frequently torn up or torn down, are inadequate to protect her from exposing herself to other inmates, including biological males. Fleming Dep. 16:11-24–17:1-7; 19:9-17. Ms. Fleming also

---

[9] Ex. B. at 3.

testified that she learned that one of the biological male inmates, CJ, had sex with a biological female inmate. Fleming Dep. 24:16-19. Sexual intercourse between inmates shows that reliance on BOP regulations preventing inmates from undressing is wholly inadequate to safeguard Ms. Fleming's constitutional right to bodily privacy. What's more, Strong admitted that BOP considered no other alternatives to the Transgender Policy. Ex. B at 5; Ex. C. at 6. As a result, a question of material fact exists on whether alternatives to the Transgender Policy exist that would protect Ms. Fleming's constitutional right to bodily privacy.

### C. No evidence shows that accommodating Ms. Fleming's constitutional right to bodily privacy would have a "ripple effect" on BOP and its inmates.

The third *Turner* factor considers how accommodating the constitutional right at issue will affect prison staff and the allocation of prison resources. *Turner*, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (citation omitted).

Strong argues that BOP created the Transgender Policy to keep staff and inmates safe and concluded that implementing the policy on a case-by-case basis was the best way to manage the transgender inmates. (Doc. 134 at 20–21). But there is plenty of contradictory evidence to dispute this assertion.

To begin, nowhere in McLearen's declaration, which Strong cites to support her argument on this point, does McLearen state what impact accommodating Ms. Fleming's constitutional right to bodily privacy would have on BOP. (*See* Doc. 133-2). Rather, Strong admitted that BOP gave no consideration to how the Transgender Policy would affect biological female inmates' right to bodily privacy. Ex. B. at 7–9; Ex. C. at 6 (admitting that "BOP did not give any consideration to biological females' right to bodily privacy when BOP considered, adopted, and implemented the Transgender Policy"). Further, the only consideration BOP gave to how the Transgender Policy would affect staff and personnel involved the staff's use of pronouns. Ex B. at 10; Ex. C at 6. As discussed in detail with respect to the fourth *Turner* factor, housing transgender inmates separately from biological male and female inmates would not strain BOP's resources or have a "ripple effect" on BOP or its inmates. Given these contradictions in the record evidence, the Court should deny summary judgment on this issue.

### D. Obvious and easy alternatives to the Transgender Policy exist.

"[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90. Strong argues that the Transgender Policy follows federal law (namely, PREA) when it considers housing placement on a case-by-case basis. (Doc. 134 at 21). But, as well intentioned as it might be, the Transgender Policy

bears all the earmarks of an "exaggerated response," and disputed issues of material facts exist on this point.

Strong asserts that PREA "prohibits BOP from placing transgender inmates in dedicated facilities, units, or wings solely on the basis of such identification or status." Ex. B. at 3; *see also* 28 C.F.R. § 115.42(g) ("The agency shall not place . . . transgender . . . inmates in dedicated facilities, units or wings on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates."). Thus, Strong and BOP effectively take the position that BOP's hands were tied because of Section 115.42, which implements PREA.

But Strong admitted that BOP never considered the possibility of rescinding Section 115.42(g) to allow BOP to create separate housing for transgender inmates. Ex. C at 6 (admitting that "BOP did not consider any alternatives to the Transgender Policy"). In discovery responses and the motion for summary judgment, Strong repeatedly refers to Section 115.42(g) as PREA. But Section 115.42(c) is not PREA. PREA is a statute passed by Congress. *See Sconiers v. Lockart*, 946 F.3d 1256, 1259 (11th Cir. 2020) (Rosenbaum, J.). Section 115.42(g) is a regulation the Department of Justice (BOP's parent agency) promulgated to implement PREA. (*See* Doc. 14 at

2–3). As such, the BOP can rescind Section 115.42(g)—just as it has done in the past with respect to the Transgender Policy. (*See* Doc. 88 at 2 n.3).

Rescinding Section 115.42(g) would allow BOP to implement an obvious and easy alternative to the Transgender Policy: separate housing for transgender inmates. Strong has admitted that "there is no known substantial cost differential in housing transgender inmates in female or male institutions, or any differences in terms of the allocation of prison resources." Ex. C at 11. Further, the only "harm" that housing transgender inmates separately would have on BOP is that "it would be in violation of [Section 115.42(g)]." Ex. C at 12. Thus, if BOP rescinded Section 115.42(g), the only posited harm of separate housing would no longer exist. *See also* Ex. C at 6 (admitting that "BOP did not give any consideration to the effect that the Transgender Policy would have on the allocation of prison resources, including medical treatment, housing, food supply, recreation, bathroom facilities, and rehabilitative programs"). So rescinding Section 115.42(g) is an easy, obvious alternative to the Transgender Policy because it would allow BOP to house biological males separately from Ms. Fleming.

In a similar case, the Fourth Circuit concluded that separate housing can sometimes be necessary. *See Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002). In *Veney*, the plaintiff, an incarcerated inmate, sued prison officials for treating him differently because of his gender and sexual preference. *Id.* at 729. Namely, the

prison officials denied his request to move into a double-occupancy cell because Veney was homosexual. *Id.* The Fourth Circuit analyzed Veney's challenge and considered the *Turner* factors. *Id.* at 732.

The court began its analysis by stating that "[p]rison safety and security are legitimate penological interests that [the court] must consider." *Id.* To that end, the Fourth Circuit recognized that "many valid reasons" supported separate housing, including sexual activity between inmates and potential violence. *Id.* at 733. The court also recognized the possibility of anti-gay violence within the prison: "In light of examples of anti-homosexual violence in our society, we cannot ignore the fact that homosexuals are subject to bias-motivated attacks from heterosexuals." *Id.* at 733. As a result, the court stated: "[I]n the prison environment, where inmates live in close quarters and their movements are restricted, prison officials reasonably may conclude that more proactive measures are required to protect homosexuals from bias-motivated attacks." *Id.* at 734. As a result of these concerns, as well as others, the Fourth Circuit concluded that separate housing was reasonably justified. *Id.* at 735; *see also Cavin*, 2018 WL 3745734, at *5–6 (denying summary judgment where the defendant failed to explain she did not use an alternative to a strip search of the plaintiff).

*Veney* is instructive on the obvious and easy alternatives of separate housing for biological males in this case. Just as separate housing was necessary to protect

against anti-gay violence in *Veney*, so too is separate housing for biological males necessary to protect Ms. Fleming's constitutional right to bodily privacy. The only harm that Strong has asserted in establishing separate housing for biological males (violation Section 115.42(g)) would no longer be a concern once the BOP rescinded that regulation.

Another Fourth Circuit case shows why Strong loses on the fourth *Turner* factor. *Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981). In that case, the district court, after a jury trial, entered judgment for plaintiff on a Section 1983 claim based on her forced removal of underclothes in front of male prison guards. *Id.* at 1119. On appeal, the Fourth Circuit affirmed the district court and concluded that the jury could accept the plaintiff's version of events that she was willing to remove her underclothes if the male guards withdrew. *Id.* at 1120. The Fourth Circuit stated: "Viewing the case in this light, as we must, it was wholly unnecessary for the male guards to remain in the room and to restrain the plaintiff while her underclothing was forcefully removed." *Id.* As a result, the Fourth Circuit affirmed the district court's judgment in the plaintiff's favor. *Id.* at 1121.

Just as the jury in *Lee* could find that an adequate alternative existed to forcing the plaintiff to expose herself to members of the opposite biological sex, so too could the Court here find at trial, after considering and observing in-person testimony, that an adequate alternative exists to forcing Ms. Fleming to expose her private parts to

members of the opposite biological sex; namely, rescinding Section 115.42(g) and creating separate housing for transgender inmates. That the factfinder could come out one way or the other on the issue of open and easy alternatives to the Transgender Policy shows that disputed issues of material fact remain.

What's more, in a recent landmark case, the Colorado Department of Corrections entered into a consent decree to create two designated housing units for transgender inmates: one in the men's prison and one in the women's prison. *Colorado could become a national model of housing transgender women in prison*, CPR News, (Apr. 8, 2024) https://www.cpr.org/2024/04/08/housing-transgender-women-in-prison-colorado/.[10] Colorado Department of Corrections' ability to create separate housing further shows that separate housing for transgender inmates is an obvious and easy alternative to the Transgender Policy. At the very least, genuine disputes of material fact exist with respect to this issue. As a result, the Court should deny Strong's motion for summary judgment.

### Conclusion

"When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights" *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974). In this case, the Court must

---

[10]  A copy of the consent decree in the Colorado case is attached as Exhibit D.

determine whether the BOP's Transgender Policy, as well-intentioned as it might be, overcomes an individual's constitutional right to bodily privacy.

As a result of the Transgender Policy, Ms. Fleming was forced to expose her private parts to members of the opposite biological sex. Disputes of material fact remain whether the Transgender Policy passes constitutional muster under the *Turner* factors. The Court will be best positioned to decide this difficult constitutional question after weighing contradictory evidence and making credibility determinations at trial. The arguments in Strong's motion fail to establish that no genuine dispute of material fact exists and that Strong is entitled to judgment as a matter of law As a result, the Court should deny Strong's motion for summary judgment.[11]

### Local Rule 7.1(K) Request for Oral Argument

Consistent with Local Rule 7.1(K), Plaintiff's counsel requests oral argument on Strong's motion for summary judgment. Counsel estimates that one hour is sufficient time for each side to present their argument and answer questions from the Court. If the Court denies Strong's motion for summary judgment and proceeds to trial, then this request for oral argument will be moot.

---

[11] Local Rule 56.1(D) allows a reply memorandum "only if the opposing memorandum raised new matters not addressed in the original supporting memorandum." Ms. Fleming's response addresses only those matters Strong raised in the motion for summary judgment. As a result, a reply memorandum is unwarranted.

Respectfully submitted,


/s/ Jeffrey P. Bristol, Esq.                    /s/ Diego M. Pestana
Jeffrey P. Bristol                              Diego M. Pestana
Florida Bar No. 1022461                         Florida Bar No. 1004436
Paul E. Parrish, Esq.                           **THE SUAREZ LAW FIRM, P.A.**
Florida Bar No. 373113                          1011 West Cleveland Street
**PARRISH LAW, P.A.**                           Tampa, FL 33606
1290 Highway A1A, Suite 101                     Telephone: (813) 229-0040
Satellite Beach, FL 32937                       Facsimile: (813) 229-0041
Telephone: (321) 622-4882                       dpestana@suarezlawfirm.com
Facsimile: (813) 712-8780
paul.parrish@theparrishlaw.com
jeffrey.bristol@theparrishlaw.com

*Counsel for Plaintiff Rhonda Fleming*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 2, 2024, a copy of this document was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Diego M. Pestana*
Diego M. Pestana