Exhibit B

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

RHONDA FLEMING,

      Plaintiff,

v.                                      Case No. 4:21-cv-325-MW-MJF

ERICA STRONG,
WARDEN OF FCI-TALLAHASSEE,

      Defendant.

_____/

## DEFENDANT'S RESPONSES TO PLAINTIFF'S
## FIRST SET OF INTERROGATORIES

Defendant, Erica Strong, in her official capacity, submits this response and makes the following General Objections to Plaintiff's Interrogatories.

1.     The objections set forth herein are based upon information now known to the Defendant and are made without prejudice to the Defendant's right to assert additional objections should be grounds for objections to be discovered at a later time.  The fact that Defendant answers or objects to any particular discovery request should not be construed as an admission or acknowledgment of any fact set forth in, assumed by, or inferred from, any such production request, interrogatory or request for admission.

2.     Defendant objects to these discovery requests to the extent that they seek information that was prepared, generated, or received in anticipation of or after the commencement of this litigation and to the extent that any inquiry or request seeks information or documents protected by the attorney-client privilege, the deliberative process privilege, the investigative file privilege, or any other evidentiary privilege, or is conditionally protected under the work-product doctrine.  Defendant's responses will be limited to non-privileged information.

3.     Defendant objects to Plaintiff's discovery requests to the extent that they seek information not relevant to Plaintiff's claims or Defendant's defenses.  Defendant

1

Exhibit 3

also objects to any request outside the relevant time period that Plaintiff was housed at FCI Tallahassee from 10/30/2018 – 5/10/2022. Defendant's responses will be limited to the time period of 10/30/2018 to 5/10/2022 and to information relevant to Plaintiff's claims.

4.      Defendant objects to all discovery requests that seek information that is beyond the Defendant's control or is in control of entities or individuals other than Defendant and the current officers, directors, employees, representatives, or agents of Defendant.

5.      Defendant reserves the right to challenge the competency, relevancy, materiality, and admissibility at hearing, or any subsequent proceeding, of this or any other action, of any information it provides in response to these discovery requests.

Defendant's responses are based upon information known or reasonably believed by the Defendant at the time these responses were prepared.  Defendant reserves the right to amend and/or supplement these responses if new information is discovered.

## INTERROGATORIES

1.     **State the penological interest served by BOP's formation, adoption, implementation, and enforcement of the Transgender Policy.**

**OBJECTIONS AND RESPONSE:** Defendant objects as irrelevant to the extent this interrogatory seeks information beyond the provisions of the Transgender Offender Manual, Program Statement 5200.08, concerning the housing of transgender inmates ("Housing Policy" or "Policy").

Notwithstanding and subject to this objection, Defendant states as follows. Numerous penological interests are served by the BOP's formation, adoption, implementation, and enforcement of the Policy.  First, the Housing Policy serves to maintain the safety and security of BOP facilities and is consistent with federal law. Inmates who are transgender may have increased risks of sexual victimization, particularly when placed in facilities that are not consistent with their gender identities.

In recognition of these risks, the Prison Rape Elimination Act of 2003, ("PREA"), mandates that in deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.  *See* 28 CFR § 115.42(c) ("In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.")  PREA also prohibits BOP from placing transgender inmates in dedicated facilities, units, or wings solely on the basis of such identification or status.  *See* 28 CFR § 115.42(g) ("The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates."). These PREA requirements are reflected in the Transgender Offender Manual. *See, generally,* Housing Policy at p. 6.

Second, the Policy ensures that BOP provides medically necessary care for transgender inmates. Pursuant to the Policy, "surgery may be the final stage in the transition process and is generally considered only after one year of clear conduct and compliance with mental health, medical, and programming services at the gender affirming facility." The placement of transgender inmates in facilities consistent with their gender identity helps to facilitate those inmates' medical care.

Third, the Housing Policy promotes consistency and uniformity. When BOP drafted the Transgender Offender Manual, it was experiencing an increase in requests for guidance from the field concerning accommodations or protections relating to inmates identifying as transgender. Because there was no enforceable written guidance as to the appropriate management of such a population at that time, it was incumbent on the BOP to create a policy for that growing population of individuals that was consistent with law, and the evolving psychological and legal landscape, to ensure consistent, appropriate and humane management of treatment of these individuals. By distilling the policy into writing within the Program Statement, the BOP sought to both guide and direct staff in a manner consistent with the law and ensure transgender inmates are housed safely and appropriately.

**2.** **Describe in detail the alternative methods or means BOP considered other than the Transgender Policy to serve the interest given in the answer to Interrogatory Number 1.**

**RESPONSE:**

Defendant objects as irrelevant to the extent this interrogatory seeks information beyond the Housing Policy. Notwithstanding and subject to this objection, Defendant states as follows.

BOP's consideration of alternatives is informed by federal law. With respect to the Housing Policy, PREA prohibits the BOP from placing transgender inmates in dedicated facilities, units, or wings solely on the basis of such identification or status. See 28 CFR § 115.42(g) ("The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates."). For that reason, simply building another institution dedicated exclusively to the housing of transgender inmates was not considered to be a viable alternative.

In addition, PREA mandates that in deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems. *See* 28 CFR § 115.42(c). Accordingly, mandating that all transgender inmates be placed in facilities inconsistent with their gender identities was not considered to be a viable alternative.

Given PREA's requirements, BOP's expert judgment was that the only viable option was to make housing decisions for transgender inmates on a case-by-case basis that takes into account the inmate's health and safety, as well as any management and security concerns.

3.      **Describe in detail why the alternative methods or means BOP given in the answer to Interrogatory Number 2 were or are insufficient to serve the interest given in the answer to Interrogatory Number 1.**

**RESPONSE:** See Defendant's response to interrogatory number 2 above.

4.      **Describe in detail the consideration, including any discussions, analysis, or correspondence, given to the effect that the Transgender Policy would have on biological females' right to bodily privacy.**

**RESPONSE:** Defendant objects as irrelevant to the extent this interrogatory seeks information beyond the Housing Policy.  Defendant further objects to the use of the term "biological" female as undefined.  Defendant will interpret this term to encompass "transgender and gender diverse" individuals consistent with the prevailing standards of care.

Notwithstanding and subject to these objections, Defendant states as follows.  All inmates housed in the BOP are afforded the right to bodily privacy. Although the BOP considered many safety and social issues beyond female inmates in developing the Housing Policy, BOP gave particular consideration to this population given that the research indicates a high rate of victimization and trauma in the female population who are incarcerated.  As such, the development of the Housing Policy was made through the lens of safety for everyone – staff, inmates who identify as transgender, and those who do not.  Specifically, as it relates to female inmates who do not identify as transgender, the BOP considered individual rights versus the collective rights through robust discussions involving a variety of experts, including the Administrator (Branch Chief) of the Women and Special Populations Branch, and representatives from Psychology Services, the Office of General Counsel, Health Services, and Correctional Programs. Additionally, the BOP consulted with external experts and stakeholders and reviewed academic literature, in considering the effect the Housing Policy would have on all people living and working in BOP facilities.

As it relates to the right to bodily privacy, BOP facilities contain multiple privacy options to allow for inmates to maintain the level of privacy desired.  For example, FCI Tallahassee showers contain privacy partitions and curtains, bathrooms have doors, and inmates are required to remain clothed in institution uniform or recreation clothing at all times. *See FCI Tallahassee Admission & Orientation Handbook ("A&O Handbook")* at 11.  Additionally, FCI Tallahassee prohibits inmates from dressing or undressing in their cubicles or rooms. *See A&O Handbook* at 12. FCI Tallahassee also prohibits inmates from being partially or completely nude in their living area.  *See* 28 C.F.R. § 115.15 (d); Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program, June 4, 2015.

7

Case 4:21-cv-00324-MW-MJF   Document 138-23   Filed 08/02/24   Page 9 of 15

("The facility shall implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia…").

     **5.**       **Describe in detail the consideration, including any discussions, analysis, or correspondence, given to accommodating biological females' right to bodily privacy upon the formation, adoption, implementation, and enforcement of the Transgender Policy.**

**RESPONSE:** Defendant objects as irrelevant to the extent this interrogatory seeks information beyond the Housing Policy. Defendant further objects to the use of the term "biological" female as undefined. Defendant will interpret this term to encompass "transgender and gender diverse" individuals consistent with the prevailing standards of care. Notwithstanding and subject to these objections, Defendant states as follows. As noted in Response to Interrogatory No. 4 and incorporated fully as if stated herein, in keeping with sound correctional practices, there are extensive privacy features in federal prisons. The policy is intended to be safe for all parties: staff, persons who identify as transgender, and persons who identify as cisgender.

6. **Describe in detail the consideration, including any discussions, analysis, or correspondence, given to the effect that the Transgender Policy would have on correctional officers and other BOP employees.**

**RESPONSE:** Defendant objects as irrelevant to the extent this interrogatory seeks information beyond the Housing Policy. Notwithstanding and subject to this objection, Defendant states as follows. All policy negotiations in the BOP, including the Transgender Offender Manual, are subject to negotiations by the Council of Prison Locals (Union). *See* Master Agreement, Federal Bureau of Prisons and Council of Prison Locals, American Federation of Government Employees, Article 3, Governing Regulations, Section d, July 21, 2014 - July 20, 2017, Extended to May 2026 available online at https://www.afge.org/globalassets/documents/cbas/cpl-master-agreement-2026.pdf; last visited February 28, 2024. Pursuant to a Memorandum of Understanding between the Agency and the Union, certain proposed polices, as was the case with the Transgender Offender Manual, Program Statement 5200.08, are negotiated as part of a Joint Policy Committee. After negotiations are initially completed by this Committee, it is then updated, and the draft policy is then circulated widely amongst managers and union members before being finalized. During that lengthy review process, local unions, which generally consists of staff of various ranks and positions, have the opportunity to consider the impact of the proposed draft policy on themselves and other employees. Specific to the development of the Transgender Offender Manual, staff's use of pronouns was discussed as something that could be confusing if a staff member was unsure which form of address to use. As such, the option to use a neutral (no pronoun) when addressing an inmate who self-identifies as transgender was specifically included in the Transgender Offender Manual.

> 7.   **Describe in detail the consideration, including any discussions, analysis, or correspondence, given to the effect that the Transgender Policy would have on the allocation of prison resources, including medical treatment, housing, food supply, recreation, bathroom facilities, and rehabilitative programs.**

**RESPONSE:** Defendant objects as irrelevant to the extent this interrogatory seeks information beyond the Housing Policy. Defendant further objects to this interrogatory as irrelevant to the extent this interrogatory seeks information on resource management beyond the housing of inmates who self-identify as transgender. Notwithstanding and subject to these objections, resource allocation is a practicality and consideration of any managed care system. In terms of housing management, there is no known substantial cost differential in housing transgender inmates in female or male institutions, or any difference in terms of the allocation of prison resources.

**8.**      **Describe in detail the effect that housing Transgender individuals separately from the biological male and female prison population would have on BOP's prison management or administration.**

**RESPONSE:** Defendant objects to the use of the term "biological male and female" as undefined.  Defendant will interpret this term to encompass "transgender and gender diverse" individuals consistent with the prevailing standards of care. Housing transgender individuals separately from the cisgender male and female prison population, absent an individualized determination and/or a court order, would have an adverse effect on the BOP's prison management and administration, and would likely violate the law.

The Prison Rape Elimination Act prohibits the BOP from placing transgender inmates in dedicated facilities, units, or wings solely on the basis of such identification or status.  *See* 28 C.F.R. § 115.42(g) ("The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.").

Accordingly, if BOP were to house transgender inmates in separate facilities, it would significantly harm BOP's prison management and administration because it would be in violation of the law.

**9.     State the number of Transgender individuals incarcerated, jailed, or housed in a BOP or FCI facility.**

**RESPONSE:** As of February 28, 2024, BOP records indicate there are 2,019 self-identified transgender individuals currently housed throughout BOP's institutions. In October of 2018, when Ms. Fleming arrived at FCI Tallahassee, there were 41 self-identified transgender individuals at FCI Tallahassee. As of April 30, 2022, before Ms. Fleming's departure, there were 70 self-identified transgender individuals at FCI Tallahassee.

## <u>VERIFICATION</u>

I hereby declare, under penalty of perjury pursuant to 28 U.S.C. 1746, and certify that the responses to "Plaintiff Rhonda Fleming's First Set of Interrogatories" are based upon information currently available to me and that, to the best of my knowledge and belief, are true and correct.

Dated this 7th day of March, 2024.

ALIX MCLEAREN
Digitally signed by ALIX MCLEAREN
Date: 2024.03.07 09:09:45 -05'00'

Alix M. McLearen, Ph.D.
Special Assistant, Director's Office
Former Acting Director, National Institute of Corrections
Former Acting Assistant Director, Reentry Services Division
Federal Bureau of Prisons

14