**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

RHONDA FLEMING,

      Plaintiff,

v.                                                    Case No. 4:21-cv-325-MW-MJF

ERICA STRONG,
WARDEN OF FCI-TALLAHASSEE,

      Defendant.

_____/

## <u>PLAINTIFF RHONDA FLEMING'S PROPOSED</u> <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Rhonda Fleming, consistent with the Court's Amended Order for Pretrial Conference (Doc. 144) and Federal Rule of Civil Procedure 52, respectfully files these proposed findings of fact and conclusions of law for Court's consideration at the January 14, 2025 bench trial.

## I.    FINDINGS OF FACT

1. Ms. Rhonda Fleming is a prisoner under federal custody of the United States.

2. Ms. Fleming was housed at Federal Corrections Institute (FCI) Tallahassee between October 2018 until January 2022.

3. In 2017, the Bureau of Prisons (BOP) codified its Transgender Policy in Program Statement 5200.04.

4. The BOP's Transgender Policy allows the BOP to house inmates according to their gender identity.

5. Under the BOP's Transgender Policy, an inmate is allowed to self-report their gender identity without verification and be housed according to that identity.

6. Pursuant to the BOP's Transgender Policy, biological/natal male inmates have been and continue to be housed with biological/natal female inmates.

7. Both at FCI Tallahassee and at other facilities, Ms. Fleming was housed with individuals who were born in the male sex and at some point in their lives transitioned to the female gender identity (i.e., biological/natal male inmates).

8. Ms. Fleming has been housed with these transgender individuals both at FCI Tallahassee and at other institutions within the BOP system.

9. The BOP has protected the bodily privacy of its inmates from its inception by creating institutional facilities divided by birth-sex. This division serves many purposes, including safety and rehabilitation, but a major factor of this separation is the preservation of bodily privacy.

10. As a prisoner within BOP custody, Ms. Fleming is one of those individuals whose safety, rehabilitation and basic dignity the BOP is responsible for protecting.

11. While BOP regulations have certain considerations for bodily privacy, such as rules against undress in public spaces unnecessarily, these regulations are necessarily incomplete.

12. During her time at FCI Tallahassee, Ms. Fleming was housed with at least two biological/natal male inmates: CJ and ET. Ms. Fleming shared a housing unit with one of these individuals.

13. Within the housing units at FCI Tallahassee, the communal shower and toilet facilities are problematic in terms of privacy accommodations.

14. There was little privacy in FCI Tallahassee's communal shower and toilet facilities for inmates.

15. In the toilet area, the stalls only had curtains for doors. There were no hard, swinging doors. These curtains provided minimal privacy. The curtains were partly transparent: A person outside the stall could look through the transparent part of the door-curtain and see an individual within the stall. The curtains also failed to cover the side of the individual stalls. Occasionally, when damaged and a replacement not yet installed, the curtains were absent entirely, depriving the occupant of the stall from any privacy from observation. Consequently, even when curtains were present, Ms. Fleming's privacy was compromised when using the toilet. When the curtains were absent, her privacy was wholly compromised.

16. FCI Tallahassee's communal shower facilities were similarly inadequate. Entering the showers, individuals are disrobed inside, so an inmate must pass others in various stages of undress. The showers were arranged so that when an inmate stood in one shower, she faced the occupant of the shower across the way—a distance of about 18 to 20 inches. While the shower stalls are divided by sheetrock, the front of the showers have only a thin and very flimsy curtain. The curtains move very much during a shower as a result of the change in pressure from the hot water. The curtains are also often dirty, meaning that occupants of the shower regularly fail to pull them across.

17. While Ms. Fleming has control over her shower curtains, which due to its movement might still reveal her naked body in the shower, she has no control over the activities of others, meaning that any person may leave their curtains open. Should a natal/biological male do this, Ms. Fleming would be exposed to their naked body involuntarily.

18. These types of exposures have in fact happened to Ms. Fleming while housed at FCI Tallahassee.

19. CJ, a biological/natal male inmate, was in the communal shower at the same time as Ms. Fleming two or three times.

4

20. ET, a biological/natal male inmate, was in the communal shower at the same time as Ms. Fleming at least twice daily.

21. During these showers with CJ or ET, Ms. Fleming's private parts and genitalia were exposed to two biological/natal male inmates.

22. Ms. Fleming's privacy violations were not limited to FCI Tallahassee.

23. Ms. Fleming has been housed at many facilities in the BOP system with other natal/biological male inmates. These prisons include Federal Medical Center (FMC) Carswell, Federal Transfer Center (FTC) Oklahoma City, United States Penitentiary (USP), Hazelton, FCI Waseca, FCI Dublin, and Federal Detention Center (FDC) Houston.

24. In these facilities, Ms. Fleming has experienced similar exposures as at FCI Tallahassee, but to a greater degree.

25. At FMC Carswell, the showers actually have no dividing walls, allowing any inmate to see across and observe the naked bodies of anyone showering at any given time.

26. At FMC Carswell, where Ms. Fleming is currently incarcerated, biological/natal female inmates are housed in the same cell with biological/natal male inmates.

27. Given Ms. Fleming's lack of control over housing assignments and the crowded nature of prison conditions, the same privacy violations she

experienced at FCI Tallahassee could happen to Ms. Fleming without her being able to prevent it and thereby protect her constitutional right to privacy.

28. At FTC Oklahoma, Ms. Fleming was housed with a biological/natal male inmate who walked among the showers, despite being in a cell with a private shower.

29. Consequently, Ms. Fleming has been forced to expose her private parts and genitalia to biological/natal male inmates on numerous occasions at multiple facilities throughout the BOP system, both within the shower and toilet areas as well as in other areas of the prison.

## II.    CONCLUSIONS OF LAW

### A.    Legal Standard

Following a bench trial, the district court "must find the facts specially and states its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decisions filed by the court." *Id.*

Subject matter jurisdiction in this matter is proper because Ms. Fleming brings her action for a violation of her constitutional right to bodily privacy, invoking this Court's federal-question jurisdiction. *See* 28 U.S.C. § 1331.

Venue is proper in this District because a substantial part of the events or omissions giving rise to Ms. Fleming's claim occurred at FCI Tallahassee. *See* 28 U.S.C. § 1391(b)(1).

The burden of proof in a civil-rights action, like this one, is the same whether the finder of fact is a judge or jury. *See LaFleur v. Wallace State Comty. Coll.*, 955 F. Supp. 1406, 1411 (M.D. Ala. 1996). "That is, a plaintiff bears the burden of satisfying the finder of fact that he or she has proven every element of his or her claim by a preponderance of the evidence." *Id.* A preponderance of evidence means that "in light of all the evidence, what [the plaintiff claims] is more likely true than not." *See* 11th Cir. Pattern Jury Instruction (Civil) 1.1 (General Preliminary Instruction).

At a bench trial, the judge is the fact finder, whose functions include weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact and issues of law. *See LaFleur*, 955 F. Supp. at 1411. The court in a bench trial has broad discretion over the admission of evidence. *See Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 776 n.13 (11th Cir. 1982).

## B. Defendant Strong Violated Ms. Fleming's Right to Bodily Privacy as a Result of the BOP's Transgender Policy

Inmates retain the constitutional right to bodily privacy. *See Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993). This includes the right for a prisoner

to not expose her private parts and genitalia to members of the opposite sex. *Id.* at 1030.

When a prison regulation or policy results in a violation of an inmate's constitutional right, including the right to bodily privacy, that regulation or policy is valid if it is reasonably related to legitimate penological interests. *See id.* at 1030. To determine whether a prison regulation or policy is reasonably related to legitimate penological interests, this Court must employ the four-factor test the Supreme Court laid out in *Turner v. Safley*, 482 U.S. 78 (1987). *See Fortner*, 684 F.2d at 1030.

The *Turner* factors ask the following questions:

(a) whether there is a "valid, rational connection" between the regulation and a legitimate government interest put forward to justify it; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally; and (d) whether the regulation represents an "exaggerated response" to prison concerns.[1]

In this case, the Defendant violated Ms. Fleming's constitutional right to bodily privacy when, as a result of the Defendant's formation, adoption, implementation, and enforcement of the BOP's Transgender Policy, Ms. Fleming was forced to expose her genitals to members of the opposite natal/biological sex while showering and using the restroom facilities at FCI Tallahassee.

---

[1] *Harris v. Thigpen*, 941 F.2d 1495, 1515–16 (11th Cir. 1991) (citing *Turner*).

The BOP codified its Transgender Policy in 2017 in Program Statement 5200.04. That policy allows the BOP to house biological/natal male inmates in prisons where biological/natal female inmates reside. Pursuant to the Transgender Policy, the Defendant housed two biological/natal male inmates, CJ and ET, at FCI Tallahassee while Ms. Fleming was also housed at FCI Tallahassee.

While Ms. Fleming was housed at FCI Tallahassee with CJ and ET, Ms. Fleming regularly used communal showers and toilets assigned for the inmates. From 2018 to 2022, the showers and toilets provided inadequate privacy for the inmates using them. Any inmate using the shower or toilet was regularly exposed (private body parts and genitalia) to other inmates in the shower or toilet.

When Ms. Fleming was housed with CJ and ET from 2018 to 2022, CJ and ET regularly used the communal shower and toilet while Ms. Fleming also used the shower and toilet. CJ used the communal shower at the same time as Ms. Fleming two or three times, and ET used the communal shower at the same time as Ms. Fleming at least twice daily. So when CJ and ET used the communal shower and toilet at the same time as Ms. Fleming, Ms. Fleming was forced to expose her private parts and genitalia to members of the opposite biological/natal sex, resulting in a violation of Ms. Fleming's constitutional right to bodily privacy. And because CJ and ET were housed at FCI Tallahassee pursuant to the Transgender Policy, the

BOP's Transgender Policy resulted in the violation of Ms. Fleming's constitutional right to bodily privacy.

Having concluded that Ms. Fleming's constitutional right to bodily privacy was violated as a result of the BOP's Transgender Policy, the Court must now consider whether that policy satisfies the four *Turner* factors. *See Fortner*, 684 F.2d at 1030.

### C.    The Transgender Policy Fails the *Turner* Factors

#### a.    No valid, rational connection exists between the Transgender Policy and any legitimate governmental interest.

The first *Turner* factor asks whether a valid, rational connection exists between the prison policy or regulation and the legitimate governmental interest put forward to justify it. *Turner*, 482 U.S. at 89.

In this case, the Transgender Policy fails the first *Turner* factor because the Defendant failed to put forward or articulate—through trial testimony or other evidence—the legitimate government interest furthered by the Transgender Policy. But, even if the Court credited the Defendant's evidence suggesting that the Transgender Policy furthers the BOP's interest in prison safety, the Defendant failed to show any valid, rational connection between the Transgender Policy and prison safety.

Although the Defendant provided evidence showing that the BOP considered prison safety when forming, adopting, implementing, and enforcing the Transgender

Policy, that evidence is contradicted by other evidence introduced at trial. Namely, admitted as evidence at trial was the Defendant's response to Ms. Fleming's First Request for Interrogatories. Those interrogatories were prepared and answered by Alix McLearen, who served as Special Assistant to the Director's Office at BOP. As was shown at trial, McLearen was instrumental to the formation, adoption, implementation, and enforcement of the Transgender Policy. But, in an interrogatory asking what consideration BOP gave to the effect that the Transgender Policy would have on correctional officers and other BOP employees, McLearen answered that the only consideration involved the BOP staff's use of preferred pronouns. No evidence has been admitted showing that the BOP considered the risks of sexual assault among inmates, possible unrest or discomfort among the inmate population, or how the Transgender Policy would affect prison staff or its administration of correctional institutions. Given this, the Court discredits testimony and other evidence the Defendant entered at trial suggesting that the Transgender Policy somehow furthers the BOP's interest in prison safety. Therefore, the Court concludes that no valid, rational connection exists between a legitimate governmental interest that is furthered by the Transgender Policy.

        b.    <u>No alternative means exist to protect Ms. Fleming's bodily privacy.</u>

The second *Turner* factor asks whether "'other avenues' remain available for the exercise of the asserted right." *Turner*, 482 U.S. at 90. In this case, no other

avenues remain to protect Ms. Fleming's right to bodily privacy other than enjoining the Transgender Policy as applied to Ms. Fleming because of the inadequate privacy in the communal showers and toilet areas in FCI Tallahassee and other correctional institutes where Mr. Fleming has been housed while the Transgender Policy is in effect.

The evidence at trial established that the communal showers and toilets at FCI Tallahassee from 2018 to 2022 provided inadequate privacy for the inmates using them. The shower curtains were flimsy and frequently torn up or torn down. Even when the flimsy shower curtains were up, the curtains did not fully cover each shower. The shower curtains are so flimsy and inadequate that when someone (whether another inmate or prison staff) walks by the shower, the curtain moves. Similarly, if water shoots out from the shower, the curtain moves.

The communal toilets at FCI Tallahassee were likewise inadequate when Ms. Fleming was housed there. The toiler stalls had no doors but were instead covered by old, flimsy shower curtains. Even when the old shower curtains were up around the toilet, the curtains did not cover the sides of the individual toilet stalls. Anyone walking by (an inmate or prison staff) could see whoever was using the toilet.

In addition to the inadequate privacy protections at FCI Tallahassee's communal shower and toilet facilities, Ms. Fleming has experienced similarly inadequate protections at other federal correctional institutes where she has been

housed since her transfer out of FCI Tallahassee. The Court credits Ms. Fleming's trial testimony that the showering setup she experiences at FCI Carswell (where she is currently housed) is similar to what she experienced at FCI Tallahassee, including inadequate privacy protections in the shower and toilet areas. Thus, given the inadequate privacy protections in the communal showers and toilet areas, and considering that the BOP's Transgender Policy is enforced nationwide, the Court concludes that no alternative means exist to protecting Ms. Fleming's constitutional right to bodily privacy than enjoining enforcement of the Transgender Policy as it applies to Ms. Fleming.

> c. <u>Accommodating Ms. Fleming's bodily privacy would not have a significant "ripple effect" on the BOP's prison staff, inmates, and allocation of prison resources.</u>

The third *Turner* factor asks how accommodating the inmate's constitutional right will affect prison staff and the allocation of prison resources. *Turner*, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (citation omitted). In this case, the Court concludes that accommodating Ms. Fleming's constitutional right to bodily privacy would not have a significant ripple effect on the BOP's prison staff, inmates, and allocation of prison resources.

Again, the Court finds noteworthy McLearen's declaration, which fails to discuss at all the impact accommodating Ms. Fleming's right to bodily privacy would have on the BOP staff and administration. The Court also finds it telling that, according to McLearen, the only consideration given about the impact the Transgender Policy would have involved the staff's use of preferred pronouns. Surely, if accommodating an inmate's constitutional right would have devastating or costly impact constituting a significant ripple effect, then the BOP would have given much more serious consideration to the Transgender Policy's other effects. Therefore, the Court concludes that accommodating Ms. Fleming's constitutional right to bodily privacy would not have a significant ripple effect on the BOP's prison staff, inmates, and allocation of prison resources.

### d.    Obvious and easy alternatives to the Transgender Policy exist.

The fourth *Turner* factor considers whether the prison regulation or policy at issue constitutes an "exaggerated response" to prison concerns. *Turner*, 482 U.S. at 90. This fourth factor "allows an inmate to 'point to an alternative that fully accommodates the prisoners' rights at de minimis cost to valid penological interests' as evidence that a restriction is not reasonable. *Fortner*, 983 F.2d at 1030 (quoting *Turner*). Here, the Court concludes that obvious and easy alternatives to the Transgender Policy exist and that the Transgender Policy bears the hallmarks of an exaggerated response to prison concerns.

14

Evidence introduced at trial showed that the BOP did not consider separate housing for transgender inmates. The Court finds that the BOP's failure to consider those possible costs means that the costs must not have been significant enough for the BOP to rule out that possibility. In fact, the Court at trial took judicial notice of a consent decree in from a state-court case in Colorado, where that State's Department of Corrections agreed to create two designated housing units for transgender inmates: one in the men's prison and one in the women's prison. The ability of the State of Colorado, which does not have as many resources as the federal government, to create separate housing for transgender inmates suggests that doing so at the federal level would not be cost prohibitive for the BOP.

Even if the BOP considered the cost of separate housing and found those costs prohibitive, another obvious and easy alternative would be to have transgender inmates use separate shower and toilet facilities from Ms. Fleming or to require the transgender inmates to use the shower and toilet facilities at a time different than when Ms. Fleming uses those same facilities. Another obvious and easy alternative would be to require FCI Tallahassee, FCI Carswell, and any federal corrections institute where Ms. Fleming is housed, to install adequate privacy protections (e.g., reliable shower curtains, doors on toilet stalls) in any communal shower in which transgender inmates might be using the facilities as the rest of the prison population. The BOP failed to rule out these easy and obvious alternatives to its current

15

enforcement of the Transgender Policy. Therefore, the Court concludes that obvious and easy alternatives to the Transgender Policy exist.

Having concluded that the Transgender Policy fails each of the four *Turner* factors, the Court now turns to whether Ms. Fleming is entitled to injunctive and declaratory relief and, if so, what is the scope of that relief.

### D.    **Injunctive and Declaratory Relief are Appropriate**

a.    <u>Ms. Fleming is entitled to a permanent injunction.</u>

"To obtain a permanent injunction, a plaintiff must show (1) that [she] has suffered an irreparable injury; (2) that [her] remedies at law are inadequate; (3) that the balance of hardships weighs in [her] favor; and (4) that a permanent injunction would not disserve the public interest." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (citing *eBay Inc v. MercExchange*, 547 U.S. 388, 391 (2006)).

A violation of the constitutional right to privacy constitutes irreparable harm. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Amer. v. City of Jacksonville*, 896 F.2d 1283, 1285–86 (11th Cir. 1990). This is because "invasions of privacy, because of their intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole." *Id.*

The Court concludes that Ms. Fleming is entitled to a permanent injunction against the BOP's Transgender Policy as it applies to her. First, the Defendant's

violation of Ms. Fleming's constitutional right to bodily privacy constitutes irreparable harm. *See Ass'n of Gen. Contractors*, 896 F.2d at 1285–86. Second, no adequate legal remedy exists because Ms. Fleming's privacy violation—by its very nature—cannot be compensated for by damages. *See id.* Third, the balance of hardships weighs in Ms. Fleming's favor because the Court can fashion a narrow remedy that ensures that Ms. Fleming's constitutional right to bodily privacy is protected while the BOP continues to enforce the Transgender Policy nationwide. Fourth, a narrowly tailored permanent injunction would not disserve the public's interest because the public has an interest in protecting all citizens' constitutional rights, including inmates, and any interest the public has in enforcing the Transgender Policy may continue to be pursued without resulting in irreparable harm to Ms. Fleming. Therefore, the Court concludes that the balance of equities weighs in favor of granting a permanent injunction in Ms. Fleming's favor. The Court will now consider the scope of that injunction.

In fashioning a remedy for Ms. Fleming, the Court finds instructive the Prisoner Reform Litigation Act, which states that a court may not issue prospective relief "unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *See Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. §

3626(a)). Therefore, this Court concludes that a narrowly tailored permanent injunction is the most appropriate remedy for Ms. Fleming.

A narrowly tailored permanent injunction that will ensure that Ms. Fleming's constitutional right to bodily privacy is protected requires the BOP to not enforce the Transgender Policy where Ms. Fleming is housed. Specifically, an injunction that prohibits the BOP from having biological/natal males from sharing a cell or using a communal shower, toilet, or restroom facilities at the same time as Ms. Fleming will ensure that Ms. Fleming will not be forced to expose her private parts and genitals to members of the opposite biological sex. This injunction is the least intrusive means necessary to correct the violation because the injunction will not require the BOP to expend additional resources in creating new housing or units for transgender inmates. The Court will enter an injunction by separate order after receiving a proposed injunction from Ms. Fleming that follows the language of this decision.

b.    <u>Ms. Fleming is entitled to a declaratory judgment.</u>

The Declaratory Judgment Act allows the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Eleventh Circuit has explained when declaratory relief is appropriate:

> For a controversy to exist, "the facts alleged, under all the circumstances, must show that there is a substantial controversy,

between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. The party who invokes a federal court's authority must show, at a "irreducible minimum." That at the time the complaint was filed, [she] has suffered some actual or threatened injury resulting from the defendant's conduct, that the injury fairly can be traced to the challenged action, and that the injury is likely to be redressed by favorable court disposition.[2]

Declaratory relief is appropriate when it will (1) serve a useful purpose in clarifying and settling the legal relations in issue, and (2) terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. *Mt. Hawley Ins. Co. v. Tactic Sec. Enforcement Inc.*, 252 F. Supp. 3d 1307, 1309 (M.D. Fla. 2017) (collecting cases) (cleaned up).

The Court concludes that a declaratory judgment in Ms. Fleming's favor against the Defendant is appropriate. When Ms. Fleming filed her complaint, she suffered actual injury when her constitutional right to bodily privacy was violated when, as a direct result of the Transgender Policy, she was forced to expose her private parts and genitals to members of the opposite biological/natal sex. In addition, while the BOP continues to enforce its nationwide Transgender Policy and Ms. Fleming is housed at federal correctional institutes with inadequate privacy protections, the threatened harm of future violations of Ms. Fleming's constitutional right to bodily privacy exists. The violations to Ms. Fleming's constitutional right to

---

[2] *Atlanta Gas Light Co. v. Aetna Cas. and Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995).

bodily privacy can be traced back to the BOP's enforcement of the Transgender Policy, and that injury can be redressed by this Court.

Declaratory relief is appropriate because a declaratory judgment will clarify and settle the novel legal issues raised in this case. Further, a declaratory judgment will terminate this matter and provide relief to Ms. Fleming who will remain in federal custody until 2032. Therefore, the Court concludes that Ms. Fleming is entitled to judgment declaring that the Defendant violated Ms. Fleming's constitutional right to bodily privacy when, pursuant to the Transgender Policy, the Defendant housed two biological/natal males, to whom Ms. Fleming was forced to expose her private parts and genitals when using communal showers, toilets, and restroom facilities at the same time as the two biological/natal males.

## Conclusion

After consideration of all the evidence, testimony, counsel argument, and briefing following a bench trial in this case, the Court finds and concludes that the Defendant violated Ms. Fleming's constitutional right to bodily privacy when, pursuant to the BOP's Transgender Policy, the Defendant housed two biological/natal males at FCI Tallahassee with Ms. Fleming, which resulted in Ms. Fleming being required to use communal showers, toilets, and restroom facilities at the same time as the two biological/natal males during which time Ms. Fleming was forced to expose her private parts and genital to members of the opposite

biological/natal sex. An appropriate injunction and judgment will be entered consistent with this Order.

Respectfully submitted,

*/s/ Jeffrey P. Bristol, Esq.*
Jeffrey P. Bristol
Florida Bar No. 1022461
Paul E. Parrish, Esq.
Florida Bar No. 373113
**PARRISH LAW, P.A.**
1290 Highway A1A, Suite 101
Satellite Beach, FL 32937
Telephone: (321) 622-4882
Facsimile: (813) 712-8780
paul.parrish@theparrishlaw.com
jeffrey.bristol@theparrishlaw.com

*/s/ Diego M. Pestana*
Diego M. Pestana
Florida Bar No. 1004436
**THE SUAREZ LAW FIRM, P.A.**
1011 West Cleveland Street
Tampa, FL 33606
Telephone: (813) 229-0040
Facsimile: (813) 229-0041
dpestana@suarezlawfirm.com

*Counsel for Plaintiff Rhonda Fleming*

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 27, 2024, a copy of this document was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Diego M. Pestana*
Diego M. Pestana