## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

RHONDA FLEMING,

      Plaintiff,

v.                                                          Case No. 4:21-cv-325-MW-MJF

ERICA STRONG,
WARDEN OF FCI-TALLAHASSEE,

      Defendant.

_____/

### PLAINTIFF RHONDA FLEMING'S TRIAL BRIEF

Rhonda Fleming, consistent with the Court's Amended Order for Pretrial Conference (Doc. 144), respectfully files trial brief to provide authorities and arguments for Ms. Fleming's position on all disputed issues of law.

### I.  INTRODUCTION

At the upcoming bench trial, the Court will have to decide one more fact-intensive issue and one more law-intensive issue. First, the more fact-intensive issue that the Court will have to decide is whether Ms. Fleming's constitutional right to bodily privacy was violated when she used communal showers, toilets, and restroom facilities, during which times she exposed her private parts and genitalia to bathe, at Federal Corrections Institute (FCI) Tallahassee when Ms. Fleming was housed there with two biological/natal male inmates CJ and ET, both of whom used the shower

1

at the same time as Ms. Fleming. If the Court finds that the answer to the first question is yes, then the second, more law-intensive issue that the Court will have to decide is whether the prison policy that resulted in CJ and ET being housed with Ms. Fleming—the Transgender Policy—passes constitutional muster based on the factors the Supreme Court set out in *Turner v. Safley*, 482 U.S. 78 (1987). Ms. Fleming anticipates that most, if not all, disputed issues of law at trial will involve the Court's *Turner* analysis. As a result, this trial brief will focus on those issues.[1]

At the outset, Ms. Fleming reiterates that she is not seeking any broad, nationwide injunction for all federal inmates. Ms. Fleming is also not challenging any BOP restricted functions other than in a capacity of violating her constitutional rights. What Ms. Fleming seeks is simple: The ability to protect her body from involuntary exposure to biological/natal males. She only asks that her constitutional rights be respected.

Ms. Fleming will demonstrate at trial that the BOP's current Transgender Policy fails adequately protect Ms. Fleming's constitutional right to bodily privacy. The evidence at trial will show how the BOP's actions fail to pass constitutional muster as applied to Ms. Fleming. The evidence at trial will show that the

---

[1]  The legal arguments in this trial brief borrows material from Ms. Fleming's response to the Defendant's motion for summary judgment and Ms. Fleming's proposed findings of fact and conclusions of law.

accommodations Ms. Fleming seeks in an as-applied manner are reasonable and narrow, while the government's actions are an unreasonable and exaggerated response to an otherwise legitimate issue (the housing of transgender inmates).

As a remedy, Ms. Fleming will ask for a narrowly tailored injunction that will present minimal impact on BOP operations. This injunction will be easy to enforce and to carry out. It will largely impact only Ms. Fleming and only insofar as it protects her constitutional rights. In addition, Ms. Fleming will ask for a declaratory judgment to vindicate her violated constitutional right.

## II.    DISPUTED ISSUES OF LAW

The *Turner* factors, which determine whether a prison policy is reasonably related to legitimate penological interests, ask the following questions:

> (a) whether there is a "valid, rational connection" between the regulation and a legitimate government interest put forward to justify it; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally; and (d) whether the regulation represents an "exaggerated response" to prison concerns.[2]

The evidence at trial will show that the Transgender Policy, which resulted in CJ and ET being housed with Ms. Fleming and sharing communal showers with her,

---

[2] *Harris v. Thigpen*, 941 F.2d 1495, 1515–16 (11th Cir. 1991) (citing *Turner*).

and during which time Ms. Fleming's private parts and genitalia were exposed to two biological/natal male inmates, fails each factor of the *Turner* test.

### A.    No Valid, Rational Connection Exists between the Transgender Policy and Any Legitimate Governmental Interest

The first *Turner* factor asks whether a valid, rational connection exists between the prison policy or regulation and the legitimate governmental interest put forward to justify it. *Turner*, 482 U.S. at 89.

In this case, the Transgender Policy fails the first *Turner* factor because the Defendant cannot put forward or articulate—through trial testimony or other evidence—the legitimate government interest furthered by the Transgender Policy. Assuming that the Defendant will argue that the Transgender Policy furthers the BOP's interest in prison safety, the Defendant cannot show any valid, rational connection between the Transgender Policy and prison safety. When the Defendant fails to show a valid, rational connection between the Transgender Policy and any legitimate governmental interest at trial, then the Court should conclude that the Transgender Policy fails the first *Turner* factor. *See Cavin v. Belfry*, No. 2:17-cv-00031, 2018 WL 3745734, *3 (W.D. Mich. July 5, 2018) ("Dismissal is not appropriate where the record fails to support a penological justification for a strip search.") (citation omitted), *adopted*, 2018 WL 3729531.

*Cavin* is instructive on this issue. There, the district court denied summary judgment on a Section 1983 claim a prisoner brought against a correctional institute

4

because of a violation of his right to privacy. *Cavin*, 2018 WL 3745734, at *1. Cavin based his claim on prison officials forcing him to remove his clothing in front of 15 to 20 other prisoners and a biological female prison officer. *Id.* The district court began its analysis by acknowledging that Cavin had a right to not expose his body unnecessarily to guards of the opposite sex. *Id.* at *3 (discussing *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987)). The court also recognized that, generally, courts "must defer to the judgment of prison officials unless the record establishes that prison policies and procedures are unreasonable." *Cavin*, 2018 WL 3745734, at *4.

Cavin argued that the defendant had no penological justification for requiring him to expose himself to other prisoners and female officers. *Id.* The defendant argued that a penological need existed but failed to support her argument with any evidence. *Id.* In rejecting the defendant's penological justification, the court dissected the defendant's argument:

> In her brief [the defendant] states: (1) "it was a high level security area" and (2) "these were prisoners that were on their way to be transported out of the prison with only three officers involved." Defendant has made no effort to explain the need for the group strip search. In fact, in her answers to interrogatories, she relies solely on a policy directive regarding searching incoming prisoners. According to Defendant, that policy is "exempt" from discovery and is not a part of the Court record. Defendant has failed to provide any evidence or support for her argument that there existed a penological need for the group strip search. Additionally, the Defendant has not explained why she was present during the search.[3]

---

[3] *Cavin*, 2018 WL 3745734, at *5.

The court also found that the defendant failed to explain why she failed to use an alternative procedure to a public strip search. *Cavin*, 2018 WL 3745734, at *6. As a result, the court found that the defendant failed to meet her burden to establish a qualified-immunity defense: "Defendant has failed to properly support her motion for summary judgment with relevant evidence showing the existence of a legitimate penological need for the group strip search and why her presence inside the chapel was necessary at the time of the search." *Id.* As a result, the court denied the defendant's motion for summary judgment. *Id.*

Just as the defendant in *Cavin* failed to support her motion with relevant evidence showing the existence of a legitimate penological need for exposing the plaintiff's private parts to a female officer, so too will the Defendant at trial fail to support her claim that the Transgender Policy, which resulted in Ms. Fleming exposing her private parts to biological/natal male inmates, furthers any legitimate penological interest. Nowhere in the government's evidence will it state what legitimate penological interest the Transgender Policy furthers. Although the Defendant at trial might assert that the Transgender Policy helps to maintain prison safety, that language is used nowhere in the Transgender Offender Manual. The lack of any evidence to showing that the Transgender Policy furthers a legitimate penological interest is fatal to the Defendant's argument. *See also Mitchell v. Stewart*, 608 F. App'x 730, 735 (11th Cir. 2015) ("We find it was clearly established

at the time of incident in question that that the Plaintiffs had a broad constitutional right to bodily privacy, and that in the light most favorable to the Plaintiffs, a reasonable jury could find that the Defendants violated that right.").

**B.    No alternative Means Exist to Protect Ms. Fleming's Bodily Privacy**

The second *Turner* factor asks whether "'other avenues' remain available for the exercise of the asserted right." *Turner*, 482 U.S. at 90. In this case, no other avenues remain to protect Ms. Fleming's right to bodily privacy other than enjoining the Transgender Policy as applied to Ms. Fleming because of the inadequate privacy in the communal showers and toilet areas in FCI Tallahassee and other correctional institutes where Mr. Fleming has been housed while the Transgender Policy is in effect.

The evidence at trial will show that the communal showers and toilets at FCI Tallahassee from 2018 to 2022 provided inadequate privacy for the inmates using them. The shower curtains were flimsy and frequently torn up or torn down. Even when the flimsy shower curtains were up, the curtains did not fully cover each shower. The shower curtains are so flimsy and inadequate that when someone (whether another inmate or prison staff) walks by the shower, the curtain moves. Similarly, if water shoots out from the shower, the curtain moves.

The communal toilets at FCI Tallahassee were likewise inadequate when Ms. Fleming was housed there. The toilet stalls had no doors but were instead covered

by old, flimsy shower curtains. Even when the old shower curtains were up around the toilet, the curtains did not cover the sides of the individual toilet stalls. Anyone walking by (an inmate or prison staff) could see whoever was using the toilet.

In addition to the inadequate privacy protections at FCI Tallahassee's communal shower and toilet facilities, Ms. Fleming has experienced similarly inadequate protections at other federal correctional institutes where she has been housed since her transfer out of FCI Tallahassee. Thus, given the inadequate privacy protections in the communal showers and toilet areas—and considering that the BOP's Transgender Policy is enforced nationwide—no alternative means exist to protecting Ms. Fleming's constitutional right to bodily privacy than enjoining enforcement of the Transgender Policy as it applies to Ms. Fleming.

### C.    Accommodating Ms. Fleming's Bodily Privacy Would Not Have a Significant "Ripple Effect" on the BOP's Prison Staff, Inmates, and Allocation of Prison Resources

The third *Turner* factor asks how accommodating the inmate's constitutional right will affect prison staff and the allocation of prison resources. *Turner*, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (citation omitted). In this case, accommodating Ms. Fleming's constitutional right to bodily privacy would not have

8

a significant ripple effect on the BOP's prison staff, inmates, and allocation of prison resources.

The evidence at trial will show that the government failed to discuss at all the impact accommodating Ms. Fleming's right to bodily privacy would have on the BOP staff and administration. The evidence will also show that the only consideration given about the impact the Transgender Policy would have involved the staff's use of preferred pronouns. If accommodating an inmate's constitutional right would have devastating or costly impact constituting a significant ripple effect, then the BOP would have given much more serious consideration to the Transgender Policy's other effects. Further, the obvious and easy alternatives discussed with respect to the fourth *Turner* factor also demonstrate that employing those alternatives would not strain BOP's resources or have a significant "ripple effect" on BOP or its inmates. Therefore, the Court should conclude that accommodating Ms. Fleming's constitutional right to bodily privacy would not have a significant ripple effect on the BOP's prison staff, inmates, and allocation of prison resources.

### D.     Obvious and Easy Alternatives to the Transgender Policy Exist.

The fourth *Turner* factor considers whether the prison regulation or policy at issue constitutes an "exaggerated response" to prison concerns. *Turner*, 482 U.S. at 90. This fourth factor "allows an inmate to 'point to an alternative that fully accommodates the prisoners' rights at de minimis cost to valid penological interests'

9

as evidence that a restriction is not reasonable. *Fortner*, 983 F.2d at 1030 (quoting *Turner*). Here, obvious and easy alternatives to the Transgender Policy exist. Instead, the Transgender Policy bears the hallmarks of an exaggerated response to prison concerns.

Evidence at trial will show that the BOP did not consider separate housing for transgender inmates. The BOP's failure to consider those possible costs means that the costs must not have been significant enough for the BOP to rule out that possibility. What's more, in a recent landmark case, the Colorado Department of Corrections entered into a consent decree to create two designated housing units for transgender inmates: one in the men's prison and one in the women's prison. *Colorado could become a national model of housing transgender women in prison*, CPR News, (Apr. 8, 2024) https://www.cpr.org/2024/04/08/housing-transgender-women-in-prison-colorado/. Colorado Department of Corrections' ability to create separate housing further shows that separate housing for transgender inmates is an obvious and easy alternative to the Transgender Policy. *See also Dothard v. Rawlinson*, 433 U.S. 321, 326 (1977) ("Like most correctional facilities in the United States, Alabama's prisons are segregated on the basis of sex.").

Even if the BOP considered the cost of separate housing and found those costs not feasible, another obvious and easy alternative would be to have transgender inmates use separate shower and toilet facilities from Ms. Fleming or to require the

transgender inmates to use the shower and toilet facilities at a time different than when Ms. Fleming uses those same facilities. Another obvious and easy alternative would be to require FCI Tallahassee, FCI Carswell, and any federal corrections institute where Ms. Fleming is housed, to install adequate privacy protections (e.g., reliable shower curtains, doors on toilet stalls) in any communal shower in which transgender inmates might be using the facilities as the rest of the prison population. The BOP failed to rule out these easy and obvious alternatives to its current enforcement of the Transgender Policy.

Ms. Fleming anticipates that the Defendant will argue at trial that regulations implementing the Prison Rape Elimination Act prohibit the BOP from considering separate housing for transgender inmates. *See* 28 C.F.R. § 115.42(g) ("The agency shall not place . . . transgender . . . inmates in dedicated facilities, units or wings on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates."). Thus, the Defendant will take the position that BOP's hands were tied because of Section 115.42, which implements PREA.

But the evidence at trial will show that BOP never considered the possibility of rescinding Section 115.42(g) to allow BOP to create separate housing for transgender inmates. Ms. Fleming anticipates that the Defendant at trial will refer to

11

Section 115.42(g) as PREA. But Section 115.42(c) is not PREA. PREA is a statute passed by Congress. *See Sconiers v. Lockart*, 946 F.3d 1256, 1259 (11th Cir. 2020) (Rosenbaum, J.). Section 115.42(g) is a regulation the Department of Justice (BOP's parent agency) promulgated to implement PREA. (*See* Doc. 14 at 2–3). As such, the BOP can rescind Section 115.42(g)—just as it has done in the past with respect to the Transgender Policy. (*See* Doc. 88 at 2 n.3).

Rescinding Section 115.42(g) would allow BOP to implement an obvious and easy alternative to the Transgender Policy: separate housing for transgender inmates. The only "harm" that housing transgender inmates separately would have on BOP is that it would violate Section 115.42(g). Thus, if BOP rescinded Section 115.42(g), the only posited harm of separate housing would no longer exist. So rescinding Section 115.42(g) is an easy, obvious alternative to the Transgender Policy because it would allow BOP to house biological males separately from Ms. Fleming.

In a similar case, the Fourth Circuit concluded that separate housing can sometimes be necessary. *See Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002). In *Veney*, the plaintiff, an incarcerated inmate, sued prison officials for treating him differently because of his gender and sexual preference. *Id.* at 729. Namely, the prison officials denied his request to move into a double-occupancy cell because Veney was homosexual. *Id.* The Fourth Circuit analyzed Veney's challenge and considered the *Turner* factors. *Id.* at 732.

The court began its analysis by stating that "[p]rison safety and security are legitimate penological interests that [the court] must consider." *Id.* To that end, the Fourth Circuit recognized that "many valid reasons" supported separate housing, including sexual activity between inmates and potential violence. *Id.* at 733. The court also recognized the possibility of anti-gay violence within the prison: "In light of examples of anti-homosexual violence in our society, we cannot ignore the fact that homosexuals are subject to bias-motivated attacks from heterosexuals." *Id.* at 733. As a result, the court stated: "[I]n the prison environment, where inmates live in close quarters and their movements are restricted, prison officials reasonably may conclude that more proactive measures are required to protect homosexuals from bias-motivated attacks." *Id.* at 734. As a result of these concerns, as well as others, the Fourth Circuit concluded that separate housing was reasonably justified. *Id.* at 735; *see also Cavin*, 2018 WL 3745734, at *5–6 (denying summary judgment where the defendant failed to explain she did not use an alternative to a strip search of the plaintiff).

*Veney* is instructive on the obvious and easy alternatives of separate housing for biological/natal male inmates in this case. Just as separate housing was necessary to protect against anti-gay violence in *Veney*, so too is separate housing for biological/natal male inmates necessary to protect Ms. Fleming's constitutional right to bodily privacy. The only harm that Strong has asserted in establishing separate

housing for biological males (violation Section 115.42(g)) would no longer be a concern once the BOP rescinded that regulation.

Another Fourth Circuit case shows why Strong loses on the fourth *Turner* factor. *See Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981). In that case, the district court, after a jury trial, entered judgment for plaintiff on a Section 1983 claim based on her forced removal of underclothes in front of male prison guards. *Id.* at 1119. On appeal, the Fourth Circuit affirmed the district court and concluded that the jury could accept the plaintiff's version of events that she was willing to remove her underclothes if the male guards withdrew. *Id.* at 1120. The Fourth Circuit stated: "Viewing the case in this light, as we must, it was wholly unnecessary for the male guards to remain in the room and to restrain the plaintiff while her underclothing was forcefully removed." *Id.* As a result, the Fourth Circuit affirmed the district court's judgment in the plaintiff's favor. *Id.* at 1121.

Just as the jury in *Lee* could find that an adequate alternative existed to forcing the plaintiff to expose herself to members of the opposite biological sex, so too will the Court at trial here, after considering and observing in-person testimony, that an adequate alternative exists to forcing Ms. Fleming to expose her private parts to members of the opposite biological sex; namely, rescinding Section 115.42(g) and creating separate housing for transgender inmates.

Therefore, the evidence at trial will show that many obvious and easy alternatives to the Transgender Policy exist.

### III.    CONCLUSION

The evidence at trial will show that Ms. Fleming's constitutional right to bodily privacy was violated when, as a result of the Transgender Policy, Ms. Fleming was forced to expose her private parts and genitalia to biological/natal male inmates in the communal showers, toilets, and restroom facilities. Once that constitutional violation is established, the Court should conclude that the Transgender Policy fails the four *Turner* factors, rendering the Transgender Policy not reasonably related to a legitimate penological interest. As a result, Ms. Fleming anticipates that, after trial, the Court will conclude that Ms. Fleming is entitled to injunctive against the Transgender Policy and declaratory relief against the Defendant.

Respectfully submitted,

/s/ *Jeffrey P. Bristol, Esq.*
Jeffrey P. Bristol
Florida Bar No. 1022461
Paul E. Parrish, Esq.
Florida Bar No. 373113
**PARRISH LAW, P.A.**
1290 Highway A1A, Suite 101
Satellite Beach, FL 32937
Telephone: (321) 622-4882
Facsimile: (813) 712-8780
paul.parrish@theparrishlaw.com
jeffrey.bristol@theparrishlaw.com

/s/ *Diego M. Pestana*
Diego M. Pestana
Florida Bar No. 1004436
**THE SUAREZ LAW FIRM, P.A.**
1011 West Cleveland Street
Tampa, FL 33606
Telephone: (813) 229-0040
Facsimile: (813) 229-0041
dpestana@suarezlawfirm.com

*Counsel for Plaintiff Rhonda Fleming*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on December 27, 2024, a copy of this document was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Diego M. Pestana*
Diego M. Pestana